Please all rise. Hear ye, hear ye, hear ye. This Honorable Appellate Court for the 2nd Judicial District is now open for assent to adjournment. The Honorable Susan F. Hutchinson will resign. Please be seated. Your Honor, this case on the docket, 2-16-0234, before the State of Illinois, the plaintiff's attorney, the esteemed Honorable Duffin, defendant of the league. Are you ready, Your Honor? Thank you, Your Honor. Ms. Christine Schwinn. Are you ready, Your Honor? Defendant of the league, Mr. George A. Johnson. Thank you, Mr. Schwinn. May it please the court, counsel. Good morning. My name is Christine Schwinn, and I am with the DuPage County State's Attorney's Office, and I represent the people in this matter. Your Honors, today we are asking that Your Honors reverse the trial court's ruling suppressing the ammunition bullets found in the driver's door of the vehicle because the trial court erred both in its analysis and its application of Michigan v. Long. Counsel, does Arizona Gant govern this case? And if not, why not? It does not. Arizona v. Gant does not cover this case. In Arizona v. Gant, it's explicitly on a search incident arrest exception to search and seizure. The defendant here was not arrested at that point. And the main difference between Long and Gant is that in Gant, part of the reason why they found that you could not search the vehicle when the defendant was secured and handcuffed is because the defendant is not going to be returning to the vehicle. He's going to be going to the police station with the officers. In Long, in those instances, you're doing a protective search, and if they don't do the protective search, the defendant or the suspects or the individuals, however you want to call them, have the opportunity to return to the vehicle so they could access weapons. And that was precisely what Justice Scalia wrote in the concurring opinion of Arizona v. Gant. And in Arizona v. Gant, they explicitly found that Long is still good law, and Long applies to protective searches, which is outside of the purview of Gant. In Collier, as in Long, and in Collier, the Illinois Supreme Court follows Long. But in both of those cases, there were items that were seen inside the vehicle that contributed to and the police officers were able to articulate to support the search for weapons, correct? Correct. In Collier, they saw the bullet in plain view. A large caliber bullet. They didn't find it. It was in plain view. That's correct. They saw that. In this case, there's nothing seen. Well, in this case, there is no weaponry seen in plain view. But what Collier does talk about is that, particularly under Terry analysis, each case is specific and unique to those set of circumstances. And in each case, would you agree that Terry, which is what Long is based upon, Terry stresses that every search for weapons, quote, must be strictly circumscribed by the exigencies and, quote, limited to that which is necessary, correct? Yes, that's correct. And here, the police officer, let's go fast forward to the actual search. The officer searches the council, correct? That's correct. Finds, quote, unquote, multiple knives. We don't know how many knives. It's not specific, but there's not contraband, correct? There is not contraband. There is- There's knives in the council, correct? Correct. The officer does not seize those knives, does he, from this record? From this record, it does not- He does not seize the knives. As you said, knives are not contraband, but knives are weapons. And if he were afraid, if he were fearful, why would he not seize those knives and hold them until the stop is over? Why not? Respectfully- The case law allows the police officer to seize a weapon, even if it's a legally possessed weapon, until the stop is complete, so that the officer feels safe. Sure, and that is what Long talks about, which is protective searches for officer safety. Now, in this set of circumstances, in looking at the record, and the record does not talk about whether or not the knives were seized. And whose obligation is that to clear that up? Well, in this instance, respectfully- Excuse me. May I just- I'm not sure I understand the question. Clear what up when you said that? It's clear the issue up as to whether or not the police officers were just simply looking for contraband. This is a motion to suppress. If the defendant establishes a prima facie case for suppression, no warrant, no consent, you've got the obligation to rebut and present some evidence, correct? Correct. If it's a prima facie case for suppression. Correct. And here, there's general information about background, correct? There is during- I'm not sure I understand about background. Well, the officer was asked what were the facts that you relied upon. He talked about background. What's the background? I believe when he talked about the background, that was in relating to when he performed the computer check and was aware that the defendant had previous arrests, several arrests for weapons and assault offenses. To get back to your point of whose burden it is, that is true. It is the defendant's burden because he is seeking to suppress the evidence. And in this case, the defendant was not charged with the knives. He was charged with the bullets. And what we're talking about and what Long talks about and what we're here today is whether or not the search, the protective search, is reasonable. Not what the protective search, you know, yielded. That may be true, but in the end, if there are knives, multiple knives in the console and three shotgun shells in the door, what's more dangerous? The knives may be more dangerous, but at that point, the defendant's arrested. It's a protective search. Correct. So why did they take the knives? Well, at that point, the defendant is arrested at that point. He was not arrested yet. Right, he was not arrested. From the record, and I'm sorry, Justice Enoff. Do we know whether the knives were taken or not? I don't know because the propriety of this motion to suppress is the bullets. And so the focus was on the bullets. But your argument is protective search for the officer's safety. Unless they're going to throw the bullets at him, he's in more danger from the knives than he is the bullets, isn't he? He is, but I believe looking at how the search transcribed, it's important to look at the time frame. What about the totality of the circumstances? What did the officer know at the time? What time was it? And what did the officer know over the totality of the circumstances? The totality of the circumstances were this. The officer pulled the defendant over around 12, 49 a.m., 1 a.m. in the morning. He was alone. There were two passengers in the car. It was late at night. It was dark. At the time when he pulled him over for speeding, the defendant and I, I set forward a lot of totality of circumstances on page two of my reply brief. I'm asking you to articulate. I'm just letting your honors know that that is where I'm pulling from. At that time, the defendant did not make much eye contact when he spoke to the officer. When the officer asked for his insurance and license, the defendant provided his license. He said he did not have his insurance. He did not know if he had insurance. The officer asked that he look through the car. The defendant looked through the visor and looked around and could not find anything. Then he told the officer, I'm going to roll up my window and proceeded to roll up the window while he searched, while I looked to search through the center console. The window was tinted. The officer asked him to roll the window down. He did not comply. And not only did he roll the window up while he looked, he turned his body and held up papers with his left hand. The officer said he held the papers in his hand. He held up papers to block the view. That was the officer's assumption. That was the testimony. That's what he said. Okay, and what else? So he turned and held up papers in the air to block the view, and it was the officer's assumption that why would you hold up papers in the air unless you were looking to block the view. Did he have any other place to put them if he took them out of the console? He had a passenger sitting in the passenger seat. He did have a passenger sitting. Should he have handed him out the window to the officer so he could hold on to him so he had two free hands? Your Honor, I am not sure, but the point is at that time the officer asked him to roll the window back down to see because he said he could not see and the defendant would not comply. Are there other factors? Then when the officer asked him why he did it, the defendant didn't respond as to why he rolled up the window. He shrugged his shoulders. He shrugged his shoulders. He's upset, basically, right? He's looking at the officer, and the officer acknowledges, he looked at me, he did give answers, his answers were short. Aren't basically all people who get pulled over late at night by police upset? That's what the Supreme Court said in Harris. Sure. So your typical response is he's using what's typical as justification for feeling fear for his safety. Respectfully, I would disagree with typical. It's not typical to roll up a tinted window and then to not comply with the officer. I was talking about his responses to the officer, the exchange, brief answers. He doesn't look at him unless he's answering a question. Is that a circumstance that should arouse fear in a police officer? Combined with what, counsel? Combined with, as Justice Zinoff said, while short answers and irritation might be innocent conduct, honest, just that, there is more than just short, curt answers and irritation. What else did he know? What else did he know? So after he rolled up the window and then he wouldn't roll it back down, the officer returned and ran a computer check on both the passenger and the defendant. What did he find? What he found out was he found out that there was an order of protection against the defendant, which had information that said that the defendant was likely to ‑‑ there was a chance of illegal use of weapons. Coupled with that, he found ‑‑ If he didn't have a FOID card, any use of weapons would be illegal, correct? Any possession would be correct. Sure, that would be correct. So his FOID card was revoked. It's not that he didn't have one. And that's also what he found out through the computer check. He's looking and learning of this, and he's learning that the defendant had arrests for weapons and assault charges. And while he's learning this, he's also seeing both the defendant and the passenger make movements that the officer described as furtive, particularly over the center console, which is what the officer was unable to see. What are they looking for? Do they have the expired insurance card yet? No. Respectfully, they did provide an expired insurance card when he rolled the window back down on the tinted window. He handed it to the officer. Here's the question. Go ahead. Did the officer testify he was concerned for his safety? He did. He did testify that he was concerned for his safety. And he testified that even when he rolled up the window, he started to become concerned. And that concern continued, especially after he saw the furtive movements over the center console, which the defendant had tried to block his view earlier. At that point, he had testified he was concerned for his safety. He went back. He called for backup. He asked the defendant to leave or exit the vehicle. He patted down the defendant. Contrary to what the court found, the record does reflect that there was a pat down as soon as the defendant exited the vehicle. And then he continued to search the vehicle. And he said to the defendant that he was going to search the vehicle in a limited fashion over the center console, over the area. He said over the center console. That was the answer that he gave at the hearing. He didn't say he was going to search the entire passenger compartment. No. Is there any restriction in where an officer can search in a vehicle under these circumstances? In Long, they said that it's a protective search for where there might be easily access. And when this defendant was released to go back to his car, would he have had access to the side pocket in the driver's side of the vehicle? Yes. Yes, your Honor. You're exactly right. And that is one of the reasons why they did a protective search of the area around the defendant. Would it be a fair inference that the officer was uncertain as to whether or not a search would be appropriate because he waited until two other officers and a sergeant arrived and then asked the sergeant whether or not he should proceed with the search? Isn't that what the facts were? The facts don't indicate the exact timeline and how the time. The facts reflect that before any search is conducted, there's four officers on the scene. And before the search, and neither person is even handcuffed, but they're outside the vehicle, and he consults with his sergeant about whether or not he should proceed with the search. Isn't that what the record shows? I believe that's what the record shows. Under Michigan v. Long, isn't control irrelevant? That is. And I was going to say that Long, to answer Justice Burkett's question, I do believe that the record reflects that there was the officer, Officer Sanchez, did tell his sergeant about searching the vehicle. I cannot recall from the record whether or not he should do that. I believe that he told the officer he was going to do that. One of the points I think here is that after these questions that you have no answer for, because they're not fully developed in the record, is that there was a motion for a directive verdict. And the trial court denied the motion for a directive verdict and essentially cut the State off and said, I don't think you can present anything else. But then the State didn't offer any evidence and didn't say, Judge, we do have more. We have an officer to testify. Here's what that background was. This is what's in the order of protection. Or call the sergeant or some other officer. Why didn't the State present any evidence in their case instead of just filing a notice of appeal? Well, I believe that during the motion to suppress, the officer did testify, and he testified substantially to a number of incidences and circumstances that he believed gave reasonable articulate suspicion. But he also said, yes, a more recent arrest, as opposed to one that's 24 years old, would be more relevant. I mean, that's essentially what he said. Yeah, but we don't know. This man is 54 years old. He's 5'2", 160 pounds. Physically, he's not a threat. So, and then the officer says, yes, a more recent arrest would be, you know, would more likely show some fear or lead to some fear. I see my time is expired. May I? Go ahead. There are going to be some other questions, but you're going to have an opportunity to go forward. First, I believe the officer didn't recall as to when the arrest was. He could not remember if it was recent or old. But I believe the larger question is, Long is all about protective searches, and the justification for a protective search is not lost merely because the officer currently has the suspect's movements under control, because if the suspect is arrested, he will go with the officers. But if he's not arrested, he will return to that vehicle. And that's the point of the protective search, which is we want to look to make sure that the suspect cannot cause harm if he is released or allowed to return to his unit. And in those cases, that line of, that language, in Long, the man is on his way back to the vehicle, ignoring the police. The police see a weapon. In Collier, there's people in the vehicle, and there's a large caliber bullet. It's a stop in front of a hotel. So those circumstances are different. And here, Judge Kelsey said, look, they were out of the vehicle. He issued the citation. They're going to get in their car and go. Respectfully, I believe that the judge seemed to conflate Gant and Long together. No question. And so, therefore, his analysis is a little flawed in that he really relies on probable cause. So we don't really get a reasonable suspicion ruling because he finds that there's reasonable suspicion for the traffic stop. But then he goes on to argue whether or not there's probable cause, whereas under a Terry analysis and Long analysis, it's whether or not there was reasonable suspicion for the protective search. And I think that's the problem with the judge's ruling, which is he conflates both. And it's notable that he conflates, excuse me, not notable, but the conflation is highlighted when he talks about whether or not the defendant is secured outside the vehicle. Would it be an appropriate remedy to remand this case for a new hearing and reverse the trial court because he applied the wrong standard and give the state an opportunity to fully devolve the record? Sure, that is potentially one outcome. But I do believe that what was presented at the motion to suppress permits this court to find that there was reasonable suspicion. What about the questions that we've asked here that there's no answer for? The recency of the arrest. What's in the order of protection? Orders of protection are designed to protect the victim in the order of protection, not the general public at large. The risk is as it pertains to that specific victim, not the general public. Your Honor, that may be true, but in this case we're looking at what the officer knew at the time. At the time, again, at the time you're talking at least several minutes after the initial conversation, after the pat-down, after he discusses it with the sergeant. And he knows that after the search took place, after he learned the information in the computer, isn't that correct? That's correct. So he had all of that information, the circumstances of the stop that you just articulated that we talked about, together with the information in the computer with regard to the fact that he had a risk of using weapons illegally, that there was an active order of protection. And doesn't Michigan v. Long tell us that the balancing required by Terry, and I'm quoting, clearly weighs in favor of allowing the police to conduct an area search of the passenger compartment to uncover weapons as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous. Don't the totality of the circumstances here allow a reasonable belief, even if there are innocent explanations for some of the actions of the defendant here? Yeah. Justice Zinoff, I could not agree with you more, that there is a total. When you look at everything that transpired during the traffic stop, there is a reasonable suspicion, or there's a reasonable, excuse me, there is a reasonable and articulable basis to stop and search for the protective search of the officer. While we don't have plain view here, is that a requirement? And instead of the plain view, do we not have all of the rest of the totality of the circumstances we were just talking about? Again, Your Honor, I would agree with you. Long does not require that there needs to be something in plain view. Additionally, long does not require that the protective search must occur immediately. In fact, in Coyer, Justice Thomas' concurring opinion talked about the fact that reasonable suspicion can arise at any time because you're looking at the conduct in totality of the circumstances. The officer said he no longer feared either the defendant or the passenger because he had patted them down. Is that relevant to our analysis? I believe, Respectfully, that that's not exactly how the cross, the directing cross went. I believe the questioning was discussions of, well, what happened when you patted him down? And he was secured. And nothing. And he was secured. He said he did not fear them any longer because he had patted them down. That was the testimony. And they weren't arrested then.  And so then were they free to go back to the vehicle? They could potentially, but the officer believed that he still wanted to conduct, to continue to conduct a protective search. So would they have been free? They would have, yes, Your Honor. And the protective search, you know, under long and Terry, a protective search is a frisk of both the person and the vehicle. So we have to kind of look at them together in that the protective search is for the officer's safety. Okay. My turn. It's, I'm going to give you a hypothetical. It's 1 o'clock in the morning in downtown State Street in Rockford, no disrespect to my colleague from Rockford, and Justice Burkett is the driver of the vehicle, no disrespect to my colleague Justice Burkett, and he's speeding. And this is an area that's a little difficult at that hour of the morning. And he stops and there's nothing going on. He does have a passenger. He's in the car with Justice Burke. And he can't find his insurance card. So he looks for it. He pulls things out of his console, including papers, and he holds them, however he holds them, and the officer can't see what's going on. And he says, okay, keep looking. Let's see what you can find. He goes back and he runs a situation. He runs the computer, finds that he's got a valid license, but he's got an order of protection pending, outstanding, not for Justice Burke but for me, and I'm not in the car. Does that mean, and by the terms of almost every order of protection I have ever seen in the statute, it prohibits the person who is governed by the order of protection from having weapons? Does that mean that the officer can get Justice Burke and Justice Burkett out of the car and search that car because there is an outstanding order of protection, which would prohibit him from having weapons, and they're looking for this insurance card in the meantime? Because if that's the case, we're going to have to start telling people who have orders of protection against them that there is another serious danger in their life. Sure. And that is what really governed his concern, isn't it? Order of protection, risk of weaponry, doesn't have a valid FOIA card. That was pretty paramount in his testimony. Go ahead and answer the question. I think in this instance, what the officer found on the computer check was not the sole reason. I agree with the other reasons, the important ones. It was nighttime. I was holding up papers while he was looking. Right. There are no previous arrests for weapons in Justice Hutchinson's case. Well, I forgot that. Justice Burkett's a bad guy. So did he have arrests for weapons and assault, as in the current case? He didn't. I think the key difference between your hypothetical and what occurred here is one of the issues is when the traffic stop began, the defendant attempted to obscure the view of the officer. And, in fact, the officer asked him to roll down the window and told him I could not see in the flashlight. And instead of attempting to placate the officer, he continued to obstruct the view such that he could not get into the Senate Council. Now, when you have that, and that is not in your hypothetical. But then he got in. Yeah, it was. He was looking for the insurance card. He had papers in his hand, and he was looking for the insurance card, and the officer did not have a clear view of it. That wasn't my hypothetical. But here's the problem. So what's he hiding in there? Is he hiding the knives? Justice Burkett, or whoever is driving that car, could easily use those knives to hurt someone. But we don't know where those knives ended up. All we really know is we have an order of protection that calls this 5'2 person a potentially dangerous person. And some movements over that council ostensibly continuing to look for an insurance card because he was told to continue to look. Well, in Duffin, he did provide an insurance card before he went back to the— But it was expired, so keep looking. Again, I believe that an order of protection alone, saying that there might be a risk, that he might be at risk for an illegal use of weapons, may alone be insufficient. But here, when you take the totality of the circumstances, the officer, as a reasonably prudent man, believed that there was a reasonable suspicion that he had a fear for his safety and danger. And, again, this statement by the officer that he no longer had was in fear after the pat-down because they were cleared for weapons. Long in all the cases, just like any situation involving a quick response, whether it's exiting circumstances to enter a home or a hotel room, it's the immediacy of the situation in many of those cases, in all those cases, including Long, that turn on whether or not a suspect's Fourth Amendment rights have been violated because police officers must make quick decisions based upon the fear that they feel at that moment in time. Quick decisions to how to protect himself or others who are in possible danger. At that point in time, with four officers on the scene, what possible danger, in light of what the officer said, that he had no fear, were the officers confronting? Well... At the time of the search, not putting things together step by step by step. The officer sergeant says, go ahead and search it. Where is the fear? Well, putting things together, though, is the totality of the circumstances because one thing on its own might be insufficient, but once you start adding things together, reasonable suspicion could arise during the duration of the traffic stop. That's precisely what happened in Colar. It began as a consensual encounter, but then once they saw something in plain view, the conduct changed. There was nothing in plain view in this case. Your Honor, you're right, there's nothing in plain view, but I'm using it merely to illustrate that an encounter with the police can change based on what transpires between the defendant or suspect and the officer. So there might be something that's innocent conduct in the beginning, but then once things begin to snowball, that, when looking at the totality of the circumstances, that can give rise to a reasonable suspicion such that, at that point, they believe they need to conduct a protective search. And, you know, I do not read the record saying that he did not fear, once you pat him down, all safety was abated. I don't believe that the interplay and back and forth. Well, we can only believe what he said. That's not what he said. I don't believe that that's what he said, but I do believe that the pat down was from this person. The pat down, the probe was from his person, that he didn't fear. On his person because he was not, he did not discover anything. Correct. Isn't that correct? Yes. He had patted him down and found nothing, so he said there was no more fear that he had from his person. But specifically, even in Colyar, Colyar quotes Long that the possibility of access to weapons in the vehicle since the driver or passenger will be allowed to return to the vehicle when the incident is completed. Correct. Isn't that the point? That is the point. That is the point in that they can return, and that's, again, going back and forth. Well, in Long, the car was off the road in a ditch. Here, the car is pulled over on the side, and there's going to be traffic citations issued. And to the point, the question was, at that point, and this is when they're out of the car, neither are handcuffed, and then there's a few questions leading up to this. So they're out of the car, general location, on the shoulder, neither are handcuffed. Quote, at that point, did you not, you did not fear for your safety from them. Is that right? Answer, no, because they had both been patted down for weapons. You were the only officer there at this time. At the time that they both got out of the car standing outside the vehicle, no. How many officers were there? Two other officers, and my sergeant had come as well. So that's the context. He no longer had fear. Two other officers had arrived, and the sergeant as well. That's the context. Respectfully, I would argue. And those shotgun shells are in the bottom of a plastic pocket holder on the side of the door. Right, in the driver's side of the door. Which could not be seen until you got in and got over it or reached down inside. But on the driver's side of the door, which if the defendant were allowed. And again, when they're making the protective search, they don't know what they're going to find. They believe that there is something that he is a safety concern. So when they go in, they're searching for an area precisely on the driver's side of the door, which is easily accessible to the driver, which is where the defendant was. Which is easily accessible to the defendant. Keep in mind the driver has short arms. He's 5'2". Justice Sienoff will have the last opportunity to question in this section of your particular argument. Justice Sienoff, do you have anything else you want to ask her? Respectfully, I would just argue that we'd ask that this court reverse the trial court's rulings. Thank you. You'll have an opportunity for reply. Mr. Thomas? May it please the Court? My name is George Thomas, T-H-O-M-S. I represent Mr. Duffin, the defendant appellee in this case. I've heard the arguments of the people and the issues that were raised by all the members of the panel, but particularly those that were raised by Justice Burkett are precisely the issues that I have. What you have is a situation in which an individual is pulled over for speeding and subsequently is unable to produce an insurance card. It's expired. Tells the officer that it's in January. Not as cold as today, perhaps, but it is January and it is cold. It is early in the morning. The vehicle is occupied by two people, the driver-defendant and his girlfriend. He presents, unlike in Michigan v. Wong, he responds immediately to the officer's request for a driver's license and insurance card. Hands him over at Michigan v. Wong. The motorist did not because he's intoxicated, obviously. He rolls up the window and wouldn't put it down, so he disobeys the officer. Isn't that correct? According to the officer's testimony in the record, he did roll up the window. But he told the officer he was going to roll up the window. That's correct. He had it up before he could respond. That's correct. But the officer says that he stood outside and asked him to roll it down. The defendant does not comply. He ignores it and then shrugs his shoulder when the officer asks him why not. So there is some, quote-unquote, disobedience. To that direction of the officer, yes, according to the record. Wouldn't that, in and of itself, cause some suspicion for a police officer when somebody who is, you know, he stopped, a legitimate stop, and he's ignoring an officer's request to roll the window down? It would cause the officer to be alerted to the fact that perhaps the individual was not going to be completely cooperative and compliant to the request. Does that mean he's potentially dangerous? No. It doesn't mean he's potentially dangerous because, as we all know, if we've been stopped, sometimes we're annoyed, it's the middle of the night, we're angry, we're angry either at being stopped or we're angry at ourselves for having been stopped. And did the knowledge that the officer gained from the computer inquiry regarding prior arrests for weapons and assault charges, would that have added to the officer's reasonable suspicion that, together with a revoked FOIA card, that he may be dangerous, might have been dangerous? I don't believe so for the following reasons. And that wouldn't have been reasonable? I don't believe that that's reasonable. Why not, counsel? Okay, I believe that it's reasonable that the officer, once again, would be suspicious, but I don't think it would rise to the level of a suspicion that would authorize someone to conduct a search of a vehicle. It would cause him to be concerned. So you're saying he has concern but not suspicion because all the cases require is a reasonable suspicion, not probable cause. That's correct. There is no probable cause required under these cases for the protected search. There is no probable cause, that's correct. Right, and COILAR. And COILAR. So you're saying you call it a hunch. I try not to use that word today, but I would say it was a hunch. And how do you say it's a hunch if he had the information, the facts? He had facts. That's what these cases talked about. This officer had facts. He had information that he got from a computer about this man's background that we just articulated. So how could that be a hunch? Okay, if you look to the record as to the interchange concerning the facts that were elicited under the computer, the officer says he did not look into a full detailed history. As he conceded later, a recent arrest would have been more concerned to him and more relevant than an old arrest. So where should that officer have drawn the line? If the arrest was six months, one year, five years, or 15 years, counsel, when the officer is standing there at 1 in the morning in the dark, together with the information we've talked about, where should he draw the line? What would have been reasonable? I guess what would be reasonable would be, according to the subjective man standard, the reasonable person standard. If I were looking at a record that were 25 years ago and I have a 52-year-old individual in front of me, that's something that occurred in his early adulthood. I would also, I believe, if I were looking at the record, want to see the full amount of the record. I want to see the disposition of those cases. There may have been trials and not cases. So you're saying the officer should have done what then? Called somebody to find out the disposition of the cases in the middle of the night? No. The same computer that has the information with regard to the arrest has the dispositions. He didn't look at them. You knew that the record shows that this man had access through the computer to the dispositions? I asked him. He was asked, did you see the results of those arrests? His response was, I did not look into the full detailed history, no. Right. So wasn't it reasonable? Well, you're saying it wasn't enough for him that he found out about assault charges and weapons charges. That wasn't enough. I'm saying that it has to be put into perspective as to the time when it occurred. The fact that there were charges is not the whole picture. The balance of the picture is when were those charges and what were the dispositions. And when he said, I did not look into the full history, no. He said he didn't recall. He may have known because he said he didn't recall. Not recalling and he said he didn't recall. When I asked how old were those arrests, he said he didn't recall. Would you agree that the trial court applied the wrong standard? Do you agree with the state that it's not probable cause? The trial court was wrong. Would you agree? I would agree that the trial court. That's number one. You would agree with that. Number two, would you agree that the state should not have been cut off in their presentation? The state should have been allowed to proceed and call witnesses. The trial court cut the state off and said, I don't think the state can present any more evidence. Was the trial court correct to do that, to simply cut it off? On a motion for directed finding, the court is supposed to assess what you've presented. If you've shown a prima facie case for suppression, the state then has the burden to fill in any holes and to rebut your case to provide information. And the trial court didn't allow the state to do that. It just cut the state off and said, it's over. I'm granting the motion. Would you agree that the trial court was wrong to do that? I don't. Justice Burkett, I don't recall that as being the exact issue.  He said, I'm granting the motion to suppress. And you did say, Judge, on the motion for directed finding, you don't have much more to say because apparently you felt things were going your way, so why stir the pot? But the trial judge then just grants your motion. Didn't the trial judge say at that time that he didn't believe the state would have anything more to introduce? Wasn't that what the record reflects? That's what the record reflects. I also believe that earlier, if I may, Justice Evans, I apologize. I also believe that Judge Kelsey had inquired if they had anything further earlier while the evidence section of the hearing was taking place. Recall, this was at argument, and I know that at that point the motion … The lawyer said, the assistant state's attorney said, well, no, Judge, at this point I have a motion for directed finding. Furnished a copy of Michigan v. Long, and Judge Kelsey on his own caught the state off and said, I don't think the state has anything else they could present. Should a trial court … You know, you're the master of your case, whether you're the defense or you're the state. It shouldn't be the trial court saying, I don't think you can present anything else. Would you agree the trial court should not have done that? I would agree that the trial court should not make the decisions on behalf of the litigants. And that would be true not just in this context, but every case that the old adage is, if you're going to try my case for me, win it. And that's … I'm sure the state probably feels that they didn't win it as a result of this. However, if I may, notwithstanding that, I believe that there really is no way that the state could introduce the evidence. And I say that because … Well, what if the record showed that within months or maybe a couple of years prior to this, the defendant had been arrested for weapons or assaults involving police officers? That would certainly, I think, cause a trial judge to view the fact that there might be greater reasonable … But what we have here is a situation in which the officer intended to make the search no matter what. He as much as conceded as part of his testimony. He was going to search the vehicle, regardless of whether the defendant consented to it, that he wanted to search it and he felt that he had a basis for it. And that decision was made by him, with a fair reading of the record, after he had done the computer check. And that's where I think that he erred. He could have found more information. He conceded that if it was a 20-year-old arrest, it would have been different. He would have viewed it differently than if it had been one, as Justice Burkett just stated, something more recent. He also could have found more details on that. He didn't. And all those are in the mind of the officer, the one who's out there having to make the decision. And if he chose not to obtain any of that information, that is a decision that he's made. And that means that there are facts … You're saying that's unreasonable? Well, I think it's probably not just unreasonable, but it's kind of dangerous on the part of the officers not to find out as much information as they can, particularly if they have some suspicion that the individual they stopped is one who might cause harm to them. Right. And, in fact, Michigan v. Law recognizes and articulates that these roadside encounters between police and suspects are especially hazardous. Hazardous is the word that's used by the U.S. Supreme Court. So you're saying that officer should have just sat there and done a longer computer search. And, again, I ask, where would you have a reasonable person cut it off? I mean, when the arrest was … how old? How many arrests? I mean, it seems, given the rest of the circumstances that were articulated by the State and reflected in this record, about the circumstances of the stop, the movements, everything we've talked about without going over all of them, that the totality of these circumstances would have given reasonable suspicion. You're looking as if the clock … I thought I heard that. We all have lots of questions, so I don't think we'll cut you off, counsel. Thank you. Wouldn't it have been reasonable to suspect that there may have been weapons in the car? No. No. You're saying no. Okay. I don't think there is, because there was no information, facts, not suspicions on the part of the officer, but reasonable, articulable facts to indicate that there was anything in the vehicle that was contraband of any type, even if it was just contraband specifically to him because he didn't have a FOIA card. They observed nothing. You believe there is a requirement of plain view? I believe that when an officer walks up to it, he has to have reasonable, articulable facts to support the belief that two things. Number one, that there is either truth to the instrumentalities of a crime within there, and two, there are circumstances that require that a search be made immediately. For safety. For safety. Protective search is what we're talking about, not just with the person, but the vehicle. Right. And what he did was he made a series of decisions that I don't think were reasonable, and as such, we all are looking at a situation and trying to determine whether it's reasonable under these circumstances, and I don't believe it is. In fact, when he re-approached the car after he had this information, he asked the defendant to get out of the car, and either he said it to the defendant or this was his thinking, I wanted to talk to him about what I found out. That's what he said was a reason for getting him out of the car. And did he tell the defendant that? He says, and I believe the record reflects it, he told the defendant that I want to talk to him. He asked twice, before and after he was out of the car, can I search your car? And the defendant said no. Should a person's exercise of his constitutional right be grounds to search or contribute in any way, shape, or form to the facts that lead to a reasonable suspicion? When a person says no, I'm not allowing you to search, can a police officer rely on that fact? No, but we can rely on that fact to make the decision or determination that in the officer's mind, he didn't believe he had grounds to search because if he did, why ask for consent? Why go through an unnecessary step? And after asking for consent and receiving a no, he then consults with his sergeant to assess whether or not he should search, which I think was either your question, I can't remember if it was the state's question or your question. He talked to the sergeant, and there were a series of questions about whether he consulted with the state's attorney's office, whether he sought advice from someone else as to whether or not there was a basis for the search. The point is that this is not an immediate situation. There was time. There was not just – Excuse me, this is a roadside traffic stop. There isn't the luxury of lots of time under the case law. Isn't that correct, counsel? At the time the initial stops are made, yes, there isn't the luxury. At the times that the law enforcement lengthens the stop in order to accomplish whatever purpose they're choosing to accomplish at that time, they can't now say that it was – the lengthening of that period of time allows the new basis for either a custodial search or a Terry type of stop and frisk. I looked at your motion. You didn't argue prolonged detention. No, I did not. Rodriguez. That's correct. That's correct because I – Even though they waited for three other officers to arrive, you didn't make that argument. That's correct. I did not. But despite the fact that I didn't make that argument and I didn't raise it as part of the motion, what – The law enforcement officer here, Judge Sanchez, Justin Sanchez, cannot use that as a basis for using this as a protective search. He lengthened it. The defendant, I'm sure, just wanted to get his tickets and go on, as most motorists do when they're stopped by law enforcement. Just get my tickets and move on. Once again, I want to talk about this order of protection. The order of protection was not against the passenger. It was against someone else, correct? That's correct. And the statute allows that weapons be taken from or removed from the person who's governed by the order of protection, and in most cases that happens. Is that your general experience? It is. All right, so what is the – I'm leaving out the arrest now because we've talked enough about that. What is the purpose, then, of this order of protection being so important in this decision? Because up until that time, he didn't seem really excited about things. In my mind, it isn't. I don't believe the fact that there was an order of protection issued against him in favor of another individual not involved in this incident should have any bearing on it. But the state is arguing that the fact that there was one and that the order contained a prohibition against possessing any firearms and the officer's testimony stated that the order of protection had a comment in it that the defendant was known to or may have had a weapon at some point. I don't know that any of that has to do with it. Well, the trial judge made an assessment that there was a risk on the part of this defendant of illegal use of weapons. There was an assessment made by the trial judge in conjunction with this order of protection that was above and beyond not allowing him to have a weapon with the order of protection. So that's what was different about this. Isn't that correct? I'm not sure that that's correct, Justice Enoff. Justice Enoff, because the record doesn't show whether the order of protection was a temporary order of protection, emergency order of protection, plenary order of protection. We don't know any of that, but we do know the fact that the trial judge made an assessment of a risk of illegal use of weapons. That's the extent of what the record shows. Had it been an emergency order of protection, the respondent, the defendant in this case, perhaps would not have had an opportunity to present any evidence. So it would be only what the other individual said. So it would be a determination made by a trial judge solely upon the statement of the protected person. But in any event, that order of protection went to the protected person. Correct. And if there was that concern, it would be to that person, not to the community at large. Correct? I think that that's the limitation that the trial judge, as Justice Enoff indicated, could make. It would be towards that individual. It wouldn't be to the public at large. All right. Justice Enoff, any other questions? Justice Burkett? No. Thank you. Thank you, Counsel. Thank you. Your Honor, I just have two quick points on rebuttal. Much of the discussion has been about individual facts. But under Terry, it's totality of the circumstances. So while an order of protection alone that talks about you can't have weapons, although in this case there was a notation that said there's a risk of I can't have firearms. Excuse me. I apologize. And a risk of use of weapons. In this one, there was a notation that there was a risk of illegal use of weapons. Because he didn't have a FOID card. Any use of a weapon would be illegal. Right? I don't know why there's a notation in there. What I do know is that we're looking at the facts of totality of the circumstances together. And there's much discussion about individual facts, which is curt responses, not looking at eye contact, order of protection. And those alone, if that was the only thing, might be insufficient to merit a protective search. But under Terry and Long, we look at the totality of the circumstances. You know, this point you keep making about the conversation and the curt responses, et cetera, those are not unusual in any traffic stop. They're not unusual at all. I mean, the Supreme Court said it in Harris. Drivers are routinely upset when they get pulled over. Sure. But even if there's a... I apologize. No, go ahead and answer. I don't disagree that... Given the fact that it is routine, that is not something that police officers find unusual. Drivers who are stopped are sometimes rude, upset. Should that be a factor? I think it can be one factor. The weight of it could be different. But I do think that what you... During the testimony, the officer was asked why did he believe he feared for his safety. And there were issues that, according to him, he believed gave weight under the totality of circumstances as to why there was a reasonable suspicion. Now, I would agree with you, Justice Burkett, that no one likes being stopped for a variety of reasons why you don't want to be pulled over by the police officer. But under Terry, it's totality of the circumstances. Here's what the officer said. And he was asked this. First, I think this was after he said he no longer feared, but then there was a follow-up question. What were the factors you relied upon? Demeanor during stop, short answers, he rolled up a tinted window, obstructed his view into the cabin, all of which are before the path down. And then the computer information and his status. Correct? Yes, I believe so. That's it? Mm-hmm. There's no remote location, no high crime area. The suspected offense is nonviolent. There's no menacing gestures or verbal threats, correct? No evasive answers or untruthful answers, correct? I don't believe... The officer had no prior experience with the defendant, which was the case in People v. Moss. His physical appearance was not threatening. He's 5'2", 160 pounds. Essentially, the officer pulled over the Pillsbury Doughboy, a little person, middle-aged, 5'2", 160, right? Correct? I believe that they're... That's what the record says. You're not verifying that it was the Pillsbury Doughboy. I believe that that's what the record reflects in terms of the stature. It's on the ticket. The police officer writes down his size and weight. The police outnumber him 2 to 1. There's four police officers, correct? At the end of the stop, yes. There's no bulging, no holster, no visible ammunition, no visible weapon, correct? Correct. No resistance or obstructive behavior? I would disagree with that. Well, the obstructive behavior would be the holding of the paperwork, correct? The obstruction would be holding of the paperwork, the turning of the body, and rolling up of the tinted window. And the officer said he didn't really find it unusual that a shorter person might have to move more in a vehicle. No resistance, correct? I would argue that the resistance would be that he's not complying with the officer's request to roll down the window. You would say that on those two factors there may be some evidence of resistance. And how about untruthful responses? No untruthful responses, correct? As far as I know that there is not any. No lies. No attempt to flee, correct? Even though he's unhandcuffed and he could have run, but he didn't run, correct? Sure, yes. And there is some history, but not specific in terms of criminal history? There's specific in that he had prior weapon arrests and assault arrests. No specifics as to the actual charge, dates, or conviction information? The record does not bear out that information. The record does bear out that there is a prior history of weapons. There's a history that there's an illegal risk of weapons. And that there's a history of the immediate past where he's not compliant with him. And after he's not compliant, he then continues to make movements over that same area. And again, what Your Honor just listed are potential factors that could go into protective searches. But we have to look at the unique circumstances of this case. And we look at the totality of the circumstances, which is here. And it is the people's position that there were a number of reasonable, articulate facts that the officer relied upon to believe that he had a protective search. I have one more question. And I think you've gone through all of them. But one more question. This is a 20-gauge shotgun shell, correct? Correct. Are you familiar at all with shotguns or caliber? I apologize, I have a very limited— This is a small caliber. And it's traditionally suited for children, younger shooters, and women. The next smallest caliber I think is a .410. And she has a valid FOIA card that's produced. The passenger. Where's the probable cause for the arrest? Even if you get to the search. Well, respectfully, what the protective search produces is really not relevant to whether or not there was a reasonable basis to conduct the protective search. I'm basically saying, where's the probable cause for the arrest? There's a valid FOIA card and three shotgun shells were covered that there's a completely innocent explanation for. Well, first, that was not the subject of the police arrest. I know, I'm asking the question. I mean, factually, maybe it's irrelevant here, but where's the probable cause for the arrest? Well, factually, again, without conceding that this— Just point out that this was not raised below. The defendant was a driver. The shotgun shells were found in the driver's passenger pocket right by him. And if you want to talk about constructive possession, there could be a potential argument on constructive possession in terms of probable cause to arrest, particularly in light of the fact that he has a revoked FOIA card. That was not the subject of the motion to suppress. And I believe, as Your Honors touched on during opposing counsel's argument, part of the problem with this case was that the court really did not apply the right standard. And from the get-go, the court was very focused on probable cause, as was defense counsel at that time, about whether or not there was probable cause to search for contraband. And as the state tried to point out, that's not the basis for the search. The search was for the protective search. And so, therefore, there was no analysis on reasonable suspicion. And if there are no further questions. Well, you said you had two points. Did you cover both of them? I believe I covered both of them. I would only point to that COLA really discusses a lot about protective searches and the interplay between different encounters with the police and suspects and individuals. And particularly on paragraph 49 and the paragraphs that follow, they talk a lot about the fact that officers don't need to rule out innocent conduct before they decide to make a protective search. And Justice Thomas, in his special concurrence, talks about the fact that reasonable suspicion can arise at any time during the stop. It's not a time-sensitive issue, which is, I think, might be some of the problems in this issue, which is, why wouldn't he have searched before? Why wouldn't he have searched now? But as Justice Thomas makes clear, reasonable suspicion can arise at any time. Well, if something can develop, a person could attempt to flee, make a movement towards his or her waist, or something during a stop, could be five minutes, could be ten minutes after stopping and say, you know what, based upon that, I'm now going to search here. The officer has the information that he has. Before he asks them to step out, the pat-downs, consultation, three other officers arrive. So the time frame, as you mentioned, it can arise at any time, but there's nothing new after he does the radio transmission. There's nothing new. Well, when he does the radio transmission, from my review of the record, when he does radio transmission, he finds the information on the computer and also sees the continued movements in the car over the center council that the defendant attempted to prohibit him from seeing. At that point, I believe the testimony was he was going to go conduct a protective search. He asked the defendant to get out of the car. He does not ask him to search the vehicle again. He asks whether or not there is anything in the vehicle that he should be concerned about. And the defendant says no. And then instead of asking, he says, well, I'm going to conduct a search of the immediate area around them. And at that point, he then does that. Now, I would agree that sometime in between leaving the car and conducting the search of the vehicle, two officers and a sergeant did arrive. I will say the record does not indicate the length of time or duration. As Justice Burkett, you pointed out, duration was not an issue during the motion to suppress. But really, a protective search under law permits both a pat-down and a protective search of the vehicle because even if they take the suspect out of the vehicle, he is still able to go back into the vehicle where he may have access to weapons. Now, there is no gun here, but that should not find that the protective search was invalid because you're looking at the time whether or not there was a safety concern. The officer believed there was a reasonable suspicion of safety concern. If the search ultimately proved fruitless, that doesn't mean that the search is invalid. It still has to tally the circumstances. Do we have another question? I'm going to ask again that this Court reverse the topic for me. Thank you. All right, Counsel. Thank you very much for your arguments this morning and for listening and answering our questions. We will take the matter under advisement. We will issue a decision in due course, and we are now going to adjourn for the day. Thank you. Thank you.